**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **Ronald S. Gross, et al.** | **Case No. 1:25-cv-01278-PAB** |
| **Plaintiffs,** | |
| **-vs-** | |
| | **JUDGE PAMELA A. BARKER** |
| **Pacific Life Insurance Company,** | |
| **Defendants.** | **MEMORANDUM OPINION & ORDER** |

Currently pending before the Court are Defendants Steven Gleicher ("Gleicher") and Primis Bank's ("Primis" and collectively, the "Primis Defendants") Motion to Dismiss filed on September 30, 2025 ("Primis's Motion to Dismiss"). (Doc. No. 19.) Plaintiffs filed an Opposition thereto on October 30, 2025, to which the Primis Defendants replied on November 13, 2025. (Doc. Nos. 24, 27.) Also pending before the Court is Defendant Pacific Life Insurance Company's ("Pacific Life" or "PacLife") Motion to Dismiss ("Pacific Life's Motion to Dismiss"). (Doc. No. 21.) Plaintiffs did not file an Opposition to Pacific Life's Motion to Dismiss. Finally, pending before the Court is Plaintiffs' Motion for Leave to Amend Complaint ("Plaintiffs' Motion for Leave") filed on October 30, 2025. (Doc. No. 25.) Plaintiffs attached thereto, their proposed First Amended Complaint ("FAC"). (Doc. No. 21-1.)[1] Pacific Life filed its Opposition to Plaintiffs' Motion for Leave on November 13, 2025 and Plaintiffs did not file a Reply. (Doc. No. 26.)

---

[1] The proposed FAC includes the following Counts as against Primis and/or Gleicher: Count I – Fraud against the Primis Defendants; Count II – Negligent Misrepresentation against the Primis Defendants; and Count IV – Rescission against Primis but not Gleicher. The proposed FAC sets forth the following Counts against Pacific Life: Count I – Fraud; Count II – Negligent Misrepresentation; Count III – Breach of Fiduciary Duty/Negligence; and Count IV – Rescission.

For the following reasons, Primis's Motion to Dismiss (Doc. No. 19) and Pacific Life's Motion to Dismiss (Doc. No. 21) are DENIED, as set forth below.  Plaintiffs' Motion for Leave (Doc. No. 25) is GRANTED.  In evaluating Primis's Motion to Dismiss and Pacific Life's Motion to Dismiss, the Court is considering the FAC as the operative Complaint and quotes from and discusses it below.  Plaintiffs shall file their FAC upon receipt of this Memorandum Opinion & Order.

## I.  Introduction

This case concerns an alleged transaction, which Plaintiffs call the "Deal."  According to Plaintiffs, the "Deal" was "the fraudulent sale of premium-financed 'springing' stranger-owned life insurance . . . policies where a third-party collateral firm . . . was guaranteed to step into the shoes of the Plaintiffs after 1 year and a day of the policy's effective date in order to subvert underwriting scrutiny." (Doc. No. 25-1, ¶ 2.)  According to Plaintiff, the Deal "would be zero risk and 'no cost' to Plaintiffs." (*Id.* at ¶ 85.)  But as Plaintiffs now allegedly recognize "in hindsight," the supposedly "zero risk" Deal "was too good to be true" leaving Plaintiffs to foot the bill.  But as with many deals that are presented as "zero risk," Plaintiffs believe they were defrauded.  (*Id.* at ¶ 33.) They now bring suit against every party involved in the Deal, which fit into three categories: (1) Defendants Cool Springs Financial Group, LLC, John McDonough ("McDonough"), and Sheran LaCaze ("LaCaze") (collectively, "Cool Springs" or the "Cool Spring Defendants"), who initially presented the "Deal" to Plaintiffs; (2) the Primis Defendants, who financed the "Deal," and (3) Pacific Life, who issued the life insurance policies as part of the "Deal."

This Opinion concerns only the latter two categories of Defendants.  The Primis Defendants and Pacific Life contend that Plaintiffs fail to state any valid claims against them.  The Court disagrees.  Although this case presents a close call, the Court finds that certain of Plaintiffs' claims

survive dismissal at this stage of the case.

## II. Background

### A. Allegations in the FAC[2]

#### 1. McDonough pitches the "Deal" to Gross

"Mr. Gross is an executive and business owner residing in Northeast Ohio with companies engaged in managing 401K retirement accounts as well as individual investment advisory services." (Doc. No. 25-1, ¶ 30.)  "In or about December 2019, Defendant McDonough pitched Mr. Gross on the Deal, which only in hindsight and discovery of the fraud, was too good to be true."  (*Id.* at ¶ 33.) According to Plaintiffs, the Deal consisted of:

a. Representations that Defendant Cool Springs and Defendant McDonough executed more than $8 billion in transactions, all without clients ever having to write a premium check.

b. Representations that a bank would fully fund the premium for an indexed life insurance policy through a loan facility.

c. Representations that a third-party Collateral Firm would provide all of the collateral needed for the loan to the bank to cover the shortfall between the collateral and the cash surrender value ("CSV") of the policy in exchange for beneficial interests in the policy's long-term CSV and/or death benefit.

d. Representations that Mr. Gross would need to create a special purpose entity, namely a limited liability company, to hold the policy.

---

[2] As noted earlier, and for the reasons set forth below, the Court is granting Plaintiffs' Motion for Leave and considering the proposed FAC attached thereto as the operative Complaint.  Therefore, the Court cites to, and quotes allegations set forth in the FAC.

3

(*Id.* at ¶ 34.)  After being presented with the Deal, McDonough clarified several items for Gross in a December 4, 2019 email, to wit:

> Mr. Gross: "How does collateral company (that puts up collateral) work[?]"
>
> McDonough: "For an upfront 5% of first year premium, they loan you the collateral needed plus charge 7% annually of the loan they are providing for the first 6 years. Then if you choose to continue year 6+ then the loan converts from 7% annual fee to 50% of death benefit irrevocably by them becoming 50% member in the LLC." (emphasis added).
>
> [ . . . . ]
>
> Mr. Gross: "Can the illustration be run with worst case scenario (no earnings on csv for entire period)[?]"
>
> McDonough: "We are already illustrating 0% interest crediting for the first 7 years. No earnings for ever [sic] is unrealistic and has never happened historically.
>
> [. . . .]
>
> Mr. Gross: "Can the illustration be run with the collateral company showing how the concept works?
>
> McDonough: "We can walk you through it. We do not illustrate it."

(*Id.* at ¶ 35.)  Consistent with this email, McDonough provided Gross with "[a]n example of the illustration" that did not "includ[e] the Collateral Firm portion of the pitch deck that is never distributed to avoid an evidentiary trail."  (*Id.* at ¶ 36.)  The illustration shows "a scenario using Zurich as the insurance carrier."  (*Id.*)

Then around August 2020, "Defendant LaCaze introduced Mr. Gross to Janis Howard via email stating that he needed to establish a few single-purpose LLCs in Ohio and indicated to Mr. Gross that Janis Howard 'is our 'go to' in establishing LLCs across the county' (sic) for Defendants Cool Springs' clients."  (*Id.* at ¶ 44.)  "Janis Howard was not an attorney but worked for the law firm of Middleton Reutlinger located in Louisville, KY."  (*Id.* at ¶ 45.)  "On August 30, 2020, Janis

4

Howard formed [Plaintiffs] Master LLC and RSG LLC on behalf of Mr. Gross and also drafted operating agreements for Mr. Gross to sign." (*Id.* at ¶ 46.)

**B.      Cool Springs enlists Pacific Life as the insurer for the "Deal"**

"Due to the COVID pandemic, little to no activity occurred with respect to the Deal until Mr. Gross emailed Defendant LaCaze on October 1, 2021, inquiring about the status of the Deal and Defendant LaCaze responded stating that Defendants Cool Springs had 'a lot of unexpected changes recently with carriers.'" (*Id.* at ¶ 47.)  On October 13, 2021, LaCaze emailed Mr. Gross explaining and advising as follows:

> "What we currently know to be true with the processing of business at Pacific Life: Cases at or above the $20mm DB [death benefit] mark go through additional financial scrutiny. This means they dig into a client's financial position on all aspects, including income and liquidity. John's [McDonough] recommendation is as follows: 1. Proceed with the Pac Life case at a total of $19mm death benefit, which will get us just below the extra scrutiny threshold[.]"

(*Id.* at ¶ 48.)  Plaintiffs allege that this email is evidence of "Defendants Cool Springs' knowledge that Mr. Gross lacked the income and liquidity for the Deal and they knowingly structured the Deal in a way that met Defendant PacLife's underwriting requirements." (*Id.* at ¶ 49.)

According to Plaintiff, "Defendant McDonough was appointed as a Producer for PacLife on or about May 26th, 2011." (*Id.* at ¶ 37.)  "As an authorized producer of Defendant PacLife, Defendant McDonough was conferred with express and apparent authority to solicit insurance applications, prepare Pacific Life illustrations, collect premiums, and deliver policies bearing the Pacific Life name and logo." (*Id.* at ¶ 38.)  "Defendant PacLife equipped Defendant McDonough with its proprietary illustration software, training materials, marketing portal, and online access to carrier-generated documents, which Defendant McDonough used to solicit Plaintiffs in this case, most of which bore Defendant PacLife's name and logo." (*Id.* at ¶ 39.)  "At all times relevant, Defendants Cool Springs

5

were acting within the course and scope of their agency with Defendant PacLife[.]" (*Id.* at ¶ 40.)

"Defendants Cool Springs always represented that they worked hand-in-hand with Defendant PacLife's home office professionals to execute strategies for high net worth clients." (*Id.* at ¶ 50.) "Using Defendant PacLife's official branding, marketing materials, and policy illustrations, Defendants Cool Springs gave Plaintiffs the impression that they were a part of Defendant PacLife's advisory network, thereby inducing Plaintiffs to rely on their representations of expertise and authority." (*Id.*) "By granting Defendant McDonough and Defendants Cool Springs this authority and furnishing them with the company's branding, sales materials, and proprietary tools, Defendant PacLife clothed them with all the trappings of authority to act on its behalf." (*Id.* at ¶ 61.) "Plaintiffs reasonably believed that Defendants Cool Springs' representations and advice were made in coordination with and on behalf of Defendant PacLife." (*Id.* at ¶ 62.)

### C.     Cool Springs enlists Primis as the financier for the "Deal"

Plaintiffs allege that "[t]hroughout the first half of 2022 Defendants Cool Springs centrally managed every aspect of the Deal, carefully avoiding any direct contact between Mr. Gross and Defendant Primis or Defendant PacLife." (*Id.* at ¶ 51.) "On June 14, 2022 Defendants Cool Springs sent Mr. Gross an email attaching Defendant Primis' credit application, indicating '[f]or your convenience, we have prefilled the application and just need your wet signatures.'" (*Id.* at ¶ 52.) According to Plaintiffs, "Defendant Primis knowingly allowed Defendants Cool Springs to complete its loan documents without verifying the factual basis of the applicant and is part of a pattern where Defendant Primis, including through its agents, purposefully avoided 'know-your-customer' regulations in order to push through profitable and low risk premium finance deals with Defendants Cool Springs, and presumably others." (*Id.* at ¶ 53.) "Accordingly, Defendant Primis underwrote

the loan for the Deal using information solely compiled and provided by Defendants Cool Springs." (*Id.* at ¶ 54.)

"Shortly after the credit application was made, Defendants Cool Springs sent Mr. Gross a loan commitment letter from Defendant Primis dated June 27, 2022 . . . [that] is signed by Defendant Primis' Senior Vice President Steven Gleicher." (*Id.* at ¶ 55.) "The loan commitment letter from Defendant Primis makes no reference to the third-party Collateral Firm in reference to the collateral that was guaranteed to secure the loan despite Defendants Cool Springs' and Steven Gleicher's knowledge of the Deal's entire structure." (*Id.* at ¶ 56.)

**D.     The "Deal" is finalized**

"On July 12, 2022, Mr. Gross signed the loan package from Defendant Primis via docusign . . . for an initial principal sum of $1,869,496 and a $186,981 money market deposit from Mr. Gross." (*Id.* at ¶ 57.) According to Plaintiff, the loan "compiled by Defendants Cool Springs and Defendant Primis contain the following misrepresentations and omissions, each of which the Defendants knew were untrue and material at the time of the loan:"

a.     "No reference is made to the Collateral Firm that was an integral part of the Deal every step of the way."

b.     The Promissory Note states 'Borrower understands that the Life Policy is not an investment[.]'"

c.     "Beneficial Ownership Disclosures from Master LLC and RSG LLC without any reference to the contemplated membership interest transfer to the Collateral Firm after 1 year and 1 day."

(*Id.* at ¶ 58.)

7

"The next day, Mr. Gross signed insurance contracts on behalf of Master LLC and RSG LLC with Defendant PacLife via docusign," and "Defendant McDonough also signed the Fraudulent Policies as the 'producer.'" (*Id.* at ¶ 59.) "Each of the policies issued to plaintiffs were underwritten, approved and funded directly through Defendant PacLife, which received and accepted the premiums, indicating to Plaintiffs that Defendants Cool Springs were acting within the scope of their authority as an agent a (sic) representative of Defendant PacLife." (*Id.* at ¶ 60.) According to Plaintiff, the policy "compiled by Defendants Cool Springs and Defendant PacLife contain[s] the following misrepresentations and omissions, each of which the Defendants knew were untrue and material at the time the policy was bound:"

a.   "'As the Applicant and/or Policyowner, I represent that the Policyowner and Beneficiary have an insurable interest in the life of the Proposed Insured(s).'"

b.   "Checked 'no' for the question 'Has any Proposed Insured(s), Policyowner(s) or Applicant entered into, or have made plans to transfer this Policy to a third party as repayment of any premium financing debt?'"

c.   "Checked the box stating 'An illustration was not presented to me' in connection with the sales process for the policy and none of the illustrations made by Defendants Cool Springs were attached to the policy and application."

d.   "'The Policy as applied for in this Application will meet my insurance needs and financial objectives based in part upon my age, income, net worth, tax and family status, and any existing insurance policies I own.'"

e.   "'I represent that all parties have an insurable interest in the life of the Proposed Insured.'"

8

    f.      "On behalf of Defendant McDonough, 'I further certify that I have also considered the Policyowner's liquidity needs, risk tolerance, and investment time horizon[.]'"

    g.     "The acknowledged disclosure that premium financing 'is an alternative method of funding and not a tool that may be utilized to purchase needed life insurance that could not otherwise be afforded.'"

(*Id.* at ¶ 63.)  "Following the policy binding and Gross Payment 1, Defendants Cool Springs were paid commissions by Defendant PacLife, and Defendant Primis paid commissions to Steven Gleicher."  (*Id.* at ¶ 64.)

### E.      The "Deal" falls apart

"After a period of time where Mr. Gross had not been informed about the Collateral Firm that was guaranteed to step in on the 366th day of the policy, he emailed Defendant LaCaze in May of 2023, to which she dismissively responded that '[w]e are about a month out from the renewal/collateral convo.'"  (*Id.* at ¶ 65.)  "On June 11, 2023, [Gross] emailed Defendant LaCaze inquiring how soon the Gross Payment 1 funds could be released to him, she responded '[o]nce we have collateral replaced, we can have your funds released within 2 weeks.'"  (*Id.* at ¶ 66.)  "Then began a period of false assurances from Defendants Cool Springs that they were actively working to secure a 'new' Collateral Firm and that Mr. Gross should just make additional collateral payments to Defendant Primis to 'buy more time.'"  (*Id.* at ¶ 67.)

Gross then made three more "payments to Defendant Primis before realizing that he had been defrauded the whole time."  (*Id.* at ¶ 68.)  "In or about November 2023, Mr. Gross discovered that the Collateral Firm 'guaranteed' to him as part of the Deal may not be in place as promised by Defendants Cool Springs."  (*Id.* at ¶ 69.)  "Between June 2023 and October 2023, a plethora of emails

evidencing Defendants Cool Springs' intent to falsely assure Mr. Gross were produced, as well as numerous conversations that were memorialized in contemporaneous notes taken by Mr. Gross." (*Id.* at ¶ 70.) "For example, on September 5, 2023, Defendant McDonough sent Mr. Gross an email with multiple avenues that Defendants Cool Springs were pursuing to justify Mr. Gross' continued need to inject cash into Defendant Primis and buy time." (*Id.* at ¶ 71.) "All of the foregoing assurances were false and intended by Defendants Cool Springs to delay the ultimate reckoning that they faced with respect to the Deal they sold to Mr. Gross and countless others." (*Id.* at ¶ 72.)

"On January 16, 2024, Mr. Gross received a default notification from Defendant Primis that he did not cure as it was now clear to him that the entire Deal was a fraud from the beginning." (*Id.* at ¶ 73.) "Subsequently, the policies with Defendant PacLife were liquidated in favor of Defendant Primis and Mr. Gross received absolutely no benefit in connection with funds he sent to Defendant Primis, totaling approximately $316,981." (*Id.* at ¶ 74.)

**F.      Plaintiffs file suit alleging fraud, negligent misrepresentation, breach of fiduciary duty and seeking rescission of the Primis loan and the Pacific Life policy.**

This lawsuit followed.  On June 19, 2025, Plaintiffs filed their Complaint.  (Doc. No. 1.) Therein, Plaintiffs assert (1) that each Defendant committed fraud (Count I), (2) that each Defendant committed negligent misrepresentation (Count II), (3) that each Defendant other than Primis and Gleicher breached their fiduciary duty owed to Plaintiffs (Count III), and (4) that as a result of the fraud, Plaintiffs are entitled to rescission of the Primis loan and the Pacific Life policy (Count IV).[3]

On September 30, 2025, Defendants LaCaze and McDonough filed their Answer.  (Doc. No. 18.)  That same day, Gleicher and Primis filed their Motion to Dismiss ("Primis's Motion to

---

[3] The FAC includes the same Counts against Pacific Life and the Primis Defendants as were included in the original Complaint.

Dismiss"), and Pacific Life filed its Motion to Dismiss ("Pacific Life's Motion to Dismiss"). (Doc. Nos. 19, 21.)  On October 30, 2025, Plaintiffs filed their Opposition to Primis's Motion to Dismiss, and filed a Motion for Leave to Amend Complaint ("Plaintiffs' Motion for Leave").  (Doc. Nos. 24, 25.)  Plaintiffs did not file an Opposition to Pacific Life's Motion to Dismiss.  In Plaintiffs' Motion for Leave, Plaintiffs assert that they "seek leave to amend their Complaint in response to arguments raised in Defendant Pacific Life Insurance's motion to dismiss" and that "[t]he proposed amendment clarifies and supplements the factual allegations and legal theories to address the issues identified by Pacifici (sic) Life, including the nature of its agency relationships with the other defendants." (Doc. No. 25.)  Plaintiffs attached a proposed Amended Complaint to Plaintiffs' Motion for Leave.  (Doc. No. 25-1.)

On November 13, 2025, Pacific Life filed an Opposition to the Motion for Leave.  (Doc. No. 26.)  Therein, Pacific Life argues that amendment would be futile, and reiterates the arguments made in its Motion to Dismiss.  That same day, Gleicher and Primis filed their Reply in support of Primis's Motion to Dismiss.  (Doc. No. 27.)  Plaintiffs did not file a reply in support of their Motion for Leave.

Accordingly, Primis's Motion to Dismiss, Pacific Life's Motion to Dismiss, and Plaintiffs' Motion for Leave are ripe for review.

## III.   Standard of Review

### A.      Motion to dismiss for failure to state a claim

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007)).  For purposes of Rule 12(b)(6), "all well-

11

pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted).

The measure of a Rule 12(b)(6) challenge — whether the Complaint raises a right to relief above the speculative level — "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly,* 550 U.S. at 555–556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007)).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

### B.    Motion for leave to amend

Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, if amending the complaint is 'futile,' the court need not grant a motion to amend. *See Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "An amendment is futile when, after including the proposed changes, the complaint still 'could not withstand a Rule 12(b)(6) motion to dismiss.'" *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 737 (6th Cir. 2022) (quoting *Rose v. Harford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)).  In other words, when a defendant opposes a plaintiff's motion to amend under Rule 15 as futile, the court looks to the "substance of the proposed amendment" to determine if the proposed amended complaint could withstand a Rule 12(b)(6) motion to dismiss. *See Beydoun*, 871 F.3d at 469 (quoting *Roskam Baking Co., Inc. v. Lanham Machinery Co., Inc.*, 288 F.3d 895, 906 (6th Cir. 2002)).

### IV.    The Court grants Plaintiffs' Motion for Leave and denies Pacific Life's Motion to Dismiss.

Upon review of Plaintiffs' Motion for Leave, the Court finds that Plaintiffs have set forth a good basis to amend their Complaint.  Pacific Life's sole opposition to Plaintiffs' Motion for Leave is that amendment would be futile. Pacific Life's arguments in its Motion to Dismiss, and in its Opposition to the Motion for Leave, can be broken down into two categories:  (1) Plaintiffs' FAC fails to allege any plausible theory of direct liability for fraud (Count I), negligent misrepresentation (Count II), breach of fiduciary duty (Count III) and fraudulent inducement (through the rescission claim) (Count IV) as against Pacific Life; and (2) Plaintiffs' FAC fails to allege any plausible theory of vicarious liability for fraud, negligent misrepresentation, breach of fiduciary duty and fraudulent

inducement (through the rescission claim) as against Pacific Life.  The Court agrees with the former, but not the latter.  As explained in detail below, the Court finds that Plaintiffs' FAC states a plausible vicarious liability theory for fraud, negligent misrepresentation, breach of fiduciary duty and fraudulent inducement (through the rescission claim) against Pacific Life.  The Court therefore grants the Motion for Leave and denies Pacific Life's Motion to Dismiss.

### A.   Plaintiffs' FAC fails to allege plausible theories of direct liability against Pacific Life.

Upon review of the FAC, the Court finds, as explained in greater detail below, that Plaintiffs have not alleged a plausible direct liability theory against Pacific Life.

### 1.   Plaintiff fails to allege direct liability against Pacific Life for fraud and negligent misrepresentation.

In its Opposition to Plaintiffs' Motion for Leave, Pacific Life argues that "[t]o the extent Plaintiffs are pursuing any kind of direct liability against Pacific Life for fraud, negligent misrepresentation, or fraudulent inducement (through the recission claim), Plaintiffs have woefully failed to allege with particularity the 'who, what, when, where, and how' of any relevant communication from Pacific Life."  (Doc. No. 26, PageID #590.)   According to Pacific Life, Plaintiffs have not "pled with any detail what 'actions' Pacific Life undertook 'to harm Plaintiffs.'" (*Id.*)  Pacific Life asserts that "Plaintiffs at times point to alleged misrepresentations by 'Defendants' writ large, but none of these are facially attributable to Pacific Life." (*Id.*)  Pacific Life further asserts that Plaintiffs' "vague, conclusory, and bundled kinds of pleading give Pacific Life insufficient notice of what it allegedly did wrong." (*Id.* at PageID #591.)  And according to Pacific Life "[t]he FAC is overwhelmingly still an attempt by the Plaintiff Gross to be made whole for pursuing a STOLI-like scheme that he participated in and that did not pan out" and "[a]s such, any liability theory that Plaintiffs may assert that Pacific Life defrauded them into entering the Deal is implausible on its

14

face." (*Id.*)

The Court generally agrees with Pacific Life—Plaintiffs have not alleged any facts establishing that Pacific Life, directly, engaged in fraud or negligent misrepresentation.

Turning first to Plaintiffs' fraud claim, a fraud claim requires: (1) a representation (or concealment of a fact when there is a duty to disclose); (2) that is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with intent to mislead another into relying upon it; (5) justifiable reliance; and (6) resulting injury proximately caused by the reliance. *See Bender v. Logan*, 76 N.E.3d 336, 352 (Ohio App. 4th Dist. 2016) (citing cases). And, in a fraud case, the plaintiff must comply with Fed. R. Civ. P. 9(b). To satisfy Rule 9(b)'s heightened pleading standard, "the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017) (cleaned up). "[A]t a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). The "particularity" requirement of Rule 9(b) precludes plaintiffs from "lumping" allegations against multiple defendants together, and it requires them to identify which defendant "made a particular misrepresentation." *Little Mt. Precision, LLC v. DR Guns, LLC*, No. 22CV1471, 2023 U.S. Dist. LEXIS 21665, at *26 (N.D Ohio Feb. 8, 2023) ("[T]he complaint improperly lumps the [defendants] together without separating out which [defendants] made a particular misrepresentation."); *Sterling v. Experian Info. Sols., Inc.*, No. 3:19-cv-2993, 2021 U.S. Dist. LEXIS 180413, at *15–16 (N.D. Ohio Sept. 22, 2021)

15

(quoting *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)) ("A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient to meet Rule 9(b)'s particularity requirements.") (cleaned up).

Here, Plaintiffs' allegations against Pacific Life fall short of stating a plausible claim for relief for fraud.  The only misrepresentations that Plaintiffs allege that Pacific Life itself made are the representations in the life insurance policy itself.  Plaintiffs allege no non-conclusory allegations as to how Pacific Life made these alleged misrepresentations "with knowledge of [their] falsity or with such utter disregard and recklessness as to whether [they are] true or false that knowledge may be inferred" and "with intent to mislead another into relying upon them."  *Bender*, 76 N.E.3d at 352.  While Plaintiffs have alleged the "who," "what," and "when" of the fraud, they have not alleged the "how" and "why" with respect to Pacific Life's alleged involvement in the fraud.

For similar reasons, Plaintiffs' allegations against Pacific Life fall short of stating a plausible claim for relief for making negligent misrepresentations.  Under Ohio law, the elements of a negligent misrepresentation claim are: (1) one who, in the course of his or her business, profession or employment, or in any other transaction in which he or she has a pecuniary interest; (2) supplies false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information; (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information. *See Abboud v. Liberty Mutual Ins. Group, Inc.*, 711 Fed. App'x 773, 777 (6th Cir. 2017) (quoting *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989); *see also Nazareth Deli LLC v. John W. Dawson Ins. Inc.*, 200 N.E.3d 652, 669 (Ohio App. 10th Dist. 2022); *Martin v. Ohio State Univ. Found.*, 742 N.E.2d 1198, 1209 (Ohio App. 10th Dist. 2000). "A negligent misrepresentation claim

does not lie for omissions: there must be an affirmative false statement." *Martin*, 742 N.E.2d at 1209; *see also Nazareth Deli*, 200 N.E.3d at 669.  Here, Plaintiffs have not pled any facts supporting these elements against Pacific Life.  Plaintiffs have not alleged any non-conclusory facts establishing that Pacific Life directly "supplies false information for the guidance of others in their business transactions" or that Pacific Life, itself, failed "to exercise reasonable care or competence in obtaining or communicating the information."

For these reasons, the Court finds that Plaintiffs' FAC does not allege a direct theory of liability against Pacific Life for fraud or negligent misrepresentation.

> **2.**    **Plaintiffs fail to allege direct liability against Pacific Life for breach of fiduciary duty.**

In its Opposition, Pacific Life asserts that "Plaintiffs have offered only conclusory allegations that Pacific Life was a fiduciary with no supporting facts."  (Doc. No. 26, PageID #598.)  Pointing to the life insurance policy attached to the Complaint, Pacific Life asserts that "Pacific Life is a product provider. It is not a fiduciary and therefore does not give advice or make recommendations regarding insurance or investment products."  (*Id.* at PageID #599.)  Pacific Life also argues that "Plaintiffs purport to allege some kind of negligence claim as part of their Count III" based on vague accusations of Pacific Life "not acting in accordance with SEC and FINRA precedent involving Defendant McDonough."  (*Id.* at PageID #599.)  Pacific Life contends that "Plaintiffs do not allege how this fits into their theories of liability, or how Pacific Life breached any duty."  (*Id.*)

Pacific Life is correct.  An insurer generally does not owe a fiduciary duty to its insured by operation of law.  *Greenberg v. Life Ins. Co.*, 177 F.3d 507, 521 (6th Cir. 1999); *Pinkerton v. Gov't Emples. Ins. Co.*, No. 5:18-cv-1371, 2019 U.S. Dist. LEXIS 33943, at *15 (N.D. Ohio Mar. 4, 2019); *Shafron v. Aviva Life & Annuity Co.*, No. 1:11 CV 732, 2014 U.S. Dist. LEXIS 22000, at *29 (N.D.

Ohio Jan. 30, 2014), *adopted by* 2014 U.S. Dist. LEXIS 21996, at *2 (N.D. Ohio Feb. 21, 2014).  "To demonstrate a fiduciary relationship, a plaintiff must show the existence of 'a relationship of special trust over and above the typical insurer-insured relationship.'"  *Owner's Mgmt. Co. v. Arthur J. Gallagher & Co.*, No. 1:17CV881, 2017 U.S. Dist. LEXIS 197985, at *7 (N.D. Ohio Dec. 1, 2017) (quoting *O'Donnell v. Financial American Life Ins. Co.*, No. 2:14-cv-1071, 2015 U.S. Dist. LEXIS 53519 (S.D. Ohio Apr. 23, 2015)).  As explained by the Sixth Circuit,

> In Ohio, a fiduciary relationship arises when "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996) (quotation omitted). "[T]he main question" to answer "is whether a party agreed to act primarily for the benefit of another." *Hope Acad. Broadway Campus v. White Hat Mgmt., L.L.C.*, 145 Ohio St. 3d 29, 2015- Ohio 3716, 46 N.E.3d 665, 676 (Ohio 2015).

*Ingram v. Regano*, No. 23-3222, 2023 U.S. App. LEXIS 27301, at *10 (6th Cir. Oct. 12, 2023).

Here, in the FAC, Plaintiffs offer nothing more than legal conclusions.  Plaintiffs generally allege in the FAC that "[b]y virtue of the relationship between Plaintiffs and the Defendants, the Defendants were fiduciaries of the Plaintiffs."  (Doc. No. 25-1, ¶ 90.)  Plaintiffs also allege that they "vested their confidence, good faith, reliance and trust in all the Defendants (including Defendant Primis), whose aid, advice, and protection was sought on matters of retirement and financial planning" and that "[t]his advice went far beyond a single routine insurance transaction and created a relationship of trust and confidence between Plaintiffs and each of the Defendants giving rise to duties of honesty, competence, full disclosure, and fiduciary obligations."  (*Id.* at ¶ 41.)  Other than these allegations, Plaintiff has not alleged any supporting facts that would give rise to a plausible breach of fiduciary duty claim directly against Pacific Life, and as Pacific Life correctly points out, the policy attached to the Complaint states that Pacific Life "is not a fiduciary and therefore does not

18

give advice or make recommendations regarding insurance or investment products."  (Doc. No. 1-5, PageID #261.)[4]  The Court therefore finds that Plaintiffs have not alleged a plausible direct theory of liability against Pacific Life for breach of fiduciary duty.

> **B.**  **Plaintiffs' FAC alleges a plausible theory of vicarious liability against PacLife.**

Having found that Plaintiffs have not alleged sufficient facts to state a plausible claim for relief for direct liability against Pacific Life, the Court next addresses whether Plaintiffs have alleged sufficient facts to state a plausible claim for relief against PacLife under a vicarious liability theory. "The respondeat superior doctrine makes an employer or principal vicariously liable for the torts of its employees or agents." *Auer v. Paliath*, 17 N.E.3d 561, 564 (Ohio 2014) (citing *Clark v. Southview Hosp. & Family Health Ctr.*, 628 N.E.2d 46 (Ohio 1994)).  To establish vicarious liability under this doctrine, the "plaintiff must demonstrate '[1] that a principal-agent relationship exists . . . and [2] that the perpetrator committed a tortious act within the scope of employment." *Keller N. Am., Inc. v. Earl*, No. 1:20CV2401, 2021 U.S. Dist. LEXIS 159201, at \*7 (N.D. Ohio Aug. 24, 2021) (quoting *Sitton v. Massage Odyssey, LLC*, 158 N.E.3d 156, 159 (Ohio App. 1st Dist. 2020)); *accord Hanson v. Kynast*, 494 N.E.2d 1091, 1093, n.4 (Ohio 1986).  The Court finds that the FAC sufficiently alleges both prongs.

> **1.**  **Plaintiffs have alleged a plausible agency relationship between McDonough and Pacific Life.**

Turning first to whether the FAC alleges an agency relationship, Pacific Life has not meaningfully disputed that it does.  Its arguments lie primarily with the second prong.  The only

---

[4] The Court does not construe Count III as alleging a simple negligence claim as Pacific Life contends.  Under Ohio law, the elements of a negligence claim are: "(1) a duty requiring the defendant to conform to a certain standard of conduct, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages." *Mowry v. United States*, No. 5:19-cv-00627, 2021 U.S. Dist. LEXIS 88502, at \*2 (N.D. Ohio May 10, 2021) (quoting *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921 (Ohio 2015)).  The FAC does not include any allegations that purport to set forth, much less set forth, the elements of a negligence claim against Pacific Life.

argument Pacific Life advances regarding the first prong is that McDonough was an independent contractor.  (Doc. No. 26, PageID #597–98.)  Pacific Life's argument, however, is premised upon matters contained outside the four corners of the FAC.  Pacific Life bases its argument on a "producer agreement" between itself and McDonough that is attached to its Opposition.  (Doc. No. 26-4.)  "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).  Because the "producer agreement" is not referred to in the FAC, the Court is precluded from considering it at this stage in this case.

And in any event, the FAC alleges something more than an independent contractor relationship.  Plaintiffs make a conclusory allegation that "Defendants Cool Springs . . . acted as agents, representatives, and authorized producers for Pacific Life Insurance Company."  (Doc. No. 25-1, ¶ 4.)  But this legal conclusion is supported by the following allegations:

- "Defendants Cool Springs presented multiple policy illustrations, projections, and written communications on Defendant PacLife's behalf."  (*Id.* at ¶ 5.)

- "Defendant McDonough used Cool[] Springs Financial Group to conduct his insurance, market Pacific Life products and receive compensation from Defendant PacLife."  (*Id.* at ¶ 21.)

- "Defendant McDonough was appointed as a Producer for PacLife on or about May 26th, 2011."  (*Id.* at ¶ 37.)

- "As an authorized producer of Defendant PacLife, Defendant McDonough was conferred with express and apparent authority to solicit insurance applications, prepare Pacific Life illustrations, collect premiums, and deliver policies bearing the Pacific Life name and logo."  (*Id.* at ¶ 38.)

- "Defendant PacLife equipped Defendant McDonough with its proprietary illustration

20

> software, training materials, marketing portal, and online access to carrier-generated documents, which Defendant McDonough used to solicit Plaintiffs in this case, most of which bore Defendant PacLife's name and logo." (*Id.* at ¶ 39.)

- "Defendants Cool Springs always represented that they worked hand-in-hand with Defendant PacLife's home office professionals to execute strategies for high net worth clients. Using Defendant PacLife's official branding, marketing materials, and policy illustrations, Defendants Cool Springs gave Plaintiffs the impression that they were a part of Defendant PacLife's advisory network, thereby inducing Plaintiffs to rely on their representations of expertise and authority." (*Id.* at ¶ 50.)

- "Each of the policies issued to plaintiffs were underwritten, approved and funded directly through Defendant PacLife, which received and accepted the premiums, indicating to Plaintiffs that Defendants Cool Springs were acting within the scope of their authority as an agent a representative of Defendant PacLife." (*Id.* at ¶ 60.)

- "By granting Defendant McDonough and Defendants Cool Springs this authority and furnishing them with the company's branding, sales materials, and proprietary tools, Defendant PacLife clothed them with all the trappings of authority to act on its behalf." (*Id.* at ¶ 61.)

- "Plaintiffs reasonably believed that Defendants Cool Springs' representations and advice were made in coordination with and on behalf of Defendant PacLife." (*Id.* at ¶ 62.)

- "Following the policy binding and Gross Payment 1, Defendants Cool Springs were paid commissions by Defendant PacLife . . . ." (*Id.* at ¶ 64.)

Viewing these allegations in the light most favorable to Plaintiffs, as the Court must do at this stage of the case, the Court finds that Plaintiffs have allege a plausible agency relationship between McDonough and Pacific Life. *See Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 373–74 (6th Cir. 1993) (holding that a district court does not err when instructing a jury "that a person who solicits an application for life insurance shall be considered the agent of the company that issues the policy and not the agent of the person insured"); *New Jersey Life Ins. Co. v. Getz*, 622 F.2d 198, 201 (6th Cir. 1980) (holding defendants were agents of insurance companies when "[t]hey performed the normal functions of agents, such as submitting the life insurance applications, receiving delivery of the

21

policies, collecting the premium payments, and giving conditional receipts" and "[t]he insurance companies paid commissions directly to them"); *see also* O.R.C. § 3911.22 ("[a]ny person who solicits an application for insurance upon the life of another person shall, in any controversy between the insured or his beneficiary and the company issuing a policy upon such application, be considered the agent of the company and not the agent of the insured.")[5]

> ### 2. Plaintiffs' FAC alleges that McDonough was acting within the scope of his alleged agency with Pacific Life.

Although Plaintiffs have alleged a plausible agency relationship, their vicarious liability theory can only proceed if McDonough was acting within the scope of his agency.   With respect to torts committed by agents, the Ohio Supreme Court has explained:

> First, the agent's tortious acts must have been "an ordinary and natural incident or attribute of the service to be rendered, or a natural, direct, and logical result of it." *Posin* at 278, citing *Tarlecka v. Morgan*, 125 Ohio St. 319, 181 N.E. 450 (1932). It is not enough that the agent's position within the principal's business simply aided her in committing the tort. *Groob*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, at ¶ 58.
>
> Most importantly, in cases "where the tort is intentional, * * * the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed * * *.'" *Byrd*, 57 Ohio St.3d at 58, 565 N.E.2d 584, quoting *Little M. R. Co. v. Wetmore*, 19 Ohio St. 110, 132 (1869). Therefore, "the determination of whether conduct is within the scope of employment or outside the scope of employment necessarily turns on the fact-finder's perception of whether the [employee] acted, or believed himself to have acted, at least in part, in his

---

[5] Pacific Life cites *Damon's Missouri, Inc. v. Davis*, 590 N.E.2d 254, 258 (Ohio 1992) in its Opposition for the proposition that "[a]ny vicarious liability theory fails accordingly because the Cool Springs Defendants were Gross's agents."  That argument misapplies the holding in *Damon's*.  Analyzing a substantially similar statute to O.R.C. § 3911.22, the Ohio Supreme Court held that "while an insurance broker (or independent insurance agent) is investigating the insurance requirements of his or her customer, the potential insured, such broker is not an agent for a particular insurer."  *Damon's Missouri, Inc. v. Davis*, 590 N.E.2d 254, 258 (Ohio 1992). But the *Damon's* Court also held that "an insurance broker becomes an agent for a particular insurer when: (1) the broker notifies its customer that he or she intends to place the customer's insurance coverage with a particular insurer; or (2) the broker accepts an application for insurance on behalf of the customer."  *Id.*  Assuming that the *Damon's* holding applies here, which at least one court has found, see *Stickney v. United Ins. Grp. Agency*, No. 3:13-cv-235, 2015 U.S. Dist. LEXIS 179846, at *41–45 (S.D. Aug. 11, 2015), then the allegations here fit squarely within *Daman's* holding.  In other words, Plaintiffs have alleged that McDonough accepted an application for insurance on their behalf, which under *Damon's* makes McDonough an agent of Pacific Life.

> employer's interests." *Ohio Gov't Risk Mgmt. Plan v. Harrison*, 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, ¶ 17; *see also* Restatement of the Law 3d, Agency, Section 7.07(2) (2006) (employee's act is outside scope of employment "when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer"). The agent's motivations and the self-interested nature of her actions are therefore necessary considerations in a scope-of-agency inquiry. *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, 857 N.E.2d 573, ¶ 28 ("if an employee's actions are self-serving or have no relationship to the employer's business, then the conduct is 'manifestly outside the scope of employment' * * *"); *Posin* at 278 ("A servant who departs from his employment to engage in affairs of his own relieves the master from liabilities for his acts").

*Auer*, 17 N.E.3d at 566.  Further, "an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Abington Emerson Capital, LLC v. Adkins*, No. 2:17-cv-143, 2021 U.S. Dist. LEXIS 30883, at *84 (S.D. Ohio Jan. 22, 2021) (quoting *Byrd v. Faber*, 565 N.E.2d 584 (1991)).

In this case, Pacific Life argues that "pursuant to Plaintiffs' own allegations and exhibits, the Deal in which Plaintiffs claim they were defrauded itself involved fraud upon Pacific Life and violations of numerous Pacific Life policies."  (Doc. No. 26, PageID #594.)  According to Pacific Life "on the face of the Complaint, it is clear that the alleged conduct was not in the scope of any agency relationship and was instead adverse to Pacific Life."  (*Id.*)  And also, according to Pacific Life, "Plaintiffs were not acting [in] good faith and did not actually or reasonably believe that the Cool Spring Defendants had authority from Pacific Life to conduct the Deal."  (*Id.* at PageID #594–95.)  Pacific Life contends "that the Deal was contrary to Pacific Life's internal operating policies (including, specifically, its 'underwriting requirements' and its anti-STOLI policies), and to avoid detection by Pacific Life, Plaintiffs and the Cool Springs Defendants deceived Pacific Life."  (*Id.* at PageID #595.)  Pacific Life finally contends that "the fraud Plaintiffs complain about does not implicate the life insurance policies. Nor does it implicate any action that Pacific Life did or would

23

delegate." (*Id.* at PageID #596.)

After considering Pacific Life's arguments and the allegations in the FAC, the Court finds there are questions of fact that cannot be decided at the pleading stage.  The Ohio Supreme Court has made it clear that the "scope of employment" prong is generally a fact question.  *Auer*, 17 N.E.3d at 566.  Even at the pleading stage, however, "the scope of employment may be determined as a matter of law where 'reasonable minds can come to but one conclusion.'"  *Prows v. City of Oxford*, No. 122-cv-693, 2023 U.S. Dist. LEXIS 100018, at *20 (S.D. Ohio June 7, 2023) (quoting *Riotte v. Cleveland*, 960 N.E. 496, 501 (Ohio App. 8th Dist. 2011)).  But a court should not dismiss a vicarious liability claim when the allegations "do not clearly demonstrate that [the agent] was acting outside of his authority or adversely to the interests of [the principal]."  *Grubbs v. Sheakley Group, Inc.*, No. 1:13-cv-246, 2014 U.S. Dist. LEXIS 6535, at *34 (S.D. Ohio Jan. 17, 2014), *adopted by* 2014 U.S. Dist. LEXIS 30656, at *3 (Mar. 10, 2014);  *Keller*, 2021 U.S. Dist. LEXIS 159201 at *9 (denying motion to dismiss vicarious liability claim when "[t]he extent of [the agency] relationship remains unknown").

Like the *Grubbs* court, the Court finds that the allegations in the Amended Complaint do not clearly demonstrate that McDonough was acting outside of his authority or adversely to the interests of Pacific Life.  Plaintiffs allege that McDonough "was conferred with express and apparent authority to solicit insurance applications, prepare Pacific Life illustrations, collect premiums, and deliver policies bearing the Pacific Life name and logo."  (Doc. No. 25-1, ¶ 38.)  And that is exactly what McDonough allegedly did here.  (*Id.* at ¶¶ 59–60.)   The Amended Complaint also suggests that Pacific Life believed McDonough was acting within the scope of his authority because Plaintiffs allege that the polices "were underwritten, *approved* and funded directly" by Pacific Life.  (*Id.* at ¶

60 (emphasis added).)  Pacific Life may ultimately be correct that McDonough failed to comply with its "internal operating policies."  And the allegations in the Amended Complaint certainly raise an eyebrow on that issue.  But the Court finds that the FAC, even if just barely, alleges enough facts to survive Pacific Life's Motion to Dismiss.  *See Getz*, 622 F.2d at 201 ("The question of fraud and collusion between [the insured and the agents] is a factual issue that can be determined only by trial"); *cf. Jones v. Ohio Nat'l Life Ins. Co.*, No. 1:20-cv-654, 2022 U.S. Dist. LEXIS 69688, at *14–15 (S.D. Ohio Apr. 15, 2022) ("In short, whether Flynn was merely selling an 'insurance policy' or an 'unsuitable security' is not so simple an inquiry as Ohio National suggests, meaning that whether his conduct was outside the scope of agency, even on Ohio National's account of events, may require further factual investigation").

**C.**   **The Court will not dismiss Plaintiffs' rescission claim against Defendant Pacific Life.**

Plaintiffs' sole theory for rescission is that "Defendant PacLife . . . fraudulently induced Plaintiffs to enter into the Fraudulent Policy," and according to them, they "are entitled to have the Fraudulent Policy . . . set aside and held for naught, and that the Plaintiffs recover damages in an amount to be proven at trial."  (Doc. No. 25-1, ¶ 97.)  And because the Court has found that Pacific Life may be vicariously liable for McDonough's alleged fraud, Plaintiffs' recission claim appears viable.  But Pacific Life argues that "the policies have already been surrendered and paid out their cash value."  (Doc. No. 26, PageID #599.)  According to Pacific Life, "Plaintiffs' remedy, if any, is limited to and satisfied by any awarded damages—not by somehow undoing a surrender payout and reforming a terminated contract to then terminate it again."  (*Id.*)

"The general rule [under Ohio law] is that a party seeking to rescind a contract or other instrument. . . must first place the other *in statu quo,* by returning all money, property, or other

25

benefits received by him under the contract which is sought to be rescinded, or by making a tender thereof to the other party." *Passa v. City of Columbus*, No. 2:03-CV-812008 U.S. Dist. LEXIS 18604, at *29 (S.D. Ohio Mar. 11, 2008) (quoting *Miller v. Bieghler*, 174 N.E. 774 (Ohio 1931)); *accord Cross v. Ledford*, 120 N.E.2d 118, 122 (Ohio 1954) ("Before a party may rescind a contract alleged to have been procured by fraudulent representations and recover the consideration paid by him, he must prove such fraudulent representations by evidence that is clear and convincing"); *Barnes v. Reserve*, 68 N.E.3d 133, 138 (Ohio App. 7th Dist. 2016) ("Appellate courts, including this Court, have concluded that in a complaint seeking rescission of a contract, some statement offering a return to status quo must be included"). Based on the allegations in the Amended Complaint, the Court finds that Plaintiffs' claim for rescission is still viable. It appears that Pacific Life could be placed *in statu quo* if Primis returns the funds it received when "the policies . . . were liquidate[d] in [its] favor." (Doc. No. 25-1, ¶ 74.) And this would likely be contingent upon Plaintiffs' claim for rescission against the Primis Defendants. But at this early stage, the Court will not dismiss Plaintiffs' rescission claim.

> **D.** **The Court rejects Pacific Life's *in pari delicto* arguments at this stage of the case.**

Pacific Life finally urges this Court to dismiss Plaintiffs' claims pursuant to *Terlecky v. Hurd (In re Dublin Sec.)*, 133 F.3d 377 (6th Cir. 1997). There, a bankruptcy trustee filed suit against several defendants who "knew or should have known of the illegal nature of the activities in which the [debtor] companies engaged, but failed to apprise the businesses of those illegalities." *Id.* at 379. In the complaint, the trustee alleged that the "debtors intentionally defrauded their investors." *Id.* at 380. The Sixth Circuit found that "[s]uch purposeful conduct thus establishes conclusively that the debtors were at least as culpable as the defendants in this matter." *Id.* The Sixth Circuit affirmed

dismissal of the complaint under the doctrine of *in pari delicto*.  The doctrine "refers to the plaintiff's participation in the same wrongdoing as the defendant" and "is premised upon the equitable principal that 'no Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act." *Id.* (quoting *Jones v. Hyatt Legal Servs. (In re Dow)*, 132 B.R. 853, 860 (Bankr. S.D. Ohio 1991)).

The Court finds *Terlecky* distinguishable.  The Court does not find, as Pacific Life contends, that "[t]he allegations make it overwhelmingly clear that Plaintiff Gross knew he was participating in a fraudulent and/or illegal transaction and intentionally signed insurance applications he knew contained significant misrepresentations."  (Doc. No. 26, PageID #601.)  Plaintiffs may very well have known that the "Deal" was illegal, but the Amended Complaint alleges a different story.  Plaintiffs assert that Defendants Cool Springs did not "fully inform[] Mr. Gross as to the "RSG LLC and Master LLC's" purpose."  (Doc. No. 25-1, ¶ 31.)  Plaintiffs also allege that Mr. Gross did not become aware of the "Deal" being potentially illegal until January 2024, after Pacific Life had issued the life insurance policy.  (*Id.* at ¶ 12.)  Unlike *Terlecky*, Plaintiffs have not admitted in the Amended Complaint they were part of the fraud.  To be sure, Pacific Life may ultimately be correct, and the doctrine may require dismissal at summary judgment.  But the doctrine of *in pari delicto* does not mandate dismissal now.

### E. The Court denies Pacific Life's Motion to Dismiss as moot.

"The general rule is that filing an amended complaint moots pending motions to dismiss." *Crawford v. Tilley*, 15 F.4th 752, 759 (6th Cir. 2021).  "Alternatively, district courts may exercise their discretion and apply a pending motion to dismiss to portions of an amended complaint that are 'substantially identical to the original complaint.'" *Id.* (quoting *Mandali v. Clark*, No. 2:13-cv-1210,

27

2014 U.S. Dist. LEXIS 143850, at *4 (S.D. Ohio Oct. 9, 2014)). Because the Court finds that Plaintiff's FAC states a claim against Pacific Life, the Court will deny Pacific Life's Motion to Dismiss as moot.

## V.    The Court denies Primis' Motion to Dismiss on the merits.

Although the Court is denying Pacific Life's Motion to Dismiss as moot, the Court will construe Primis' Motion to Dismiss as a motion to dismiss the FAC which merely added allegations relevant to Plaintiffs claims against Pacific Life. The allegations in the FAC relevant to Plaintiffs' claims against Primis and Gleicher are "substantially identical to the original complaint." The Court therefore will not deny Primis' Motion to Dismiss as moot. *Hacker v. ArcelorMittal Tubular Prods. USA LLC*, No. 1:24-CV-00341, 2025 U.S. Dist. LEXIS 55848, at *5, n.1 (N.D. Ohio Mar. 26, 2025); *Melton v. Minn. Life Ins.*, No. 6:23-CV-174-REW-HAI, 2024 U.S. Dist. LEXIS 165196, at *6, n.4 (E.D. Ky. Sept. 13, 2024); *Beatty v. ACNTV*, No. 3:21-CV-341-KAC-JEM, 2023 U.S. Dist. LEXIS 37780, at *2, n.1 (E.D. Tenn. Mar. 7, 2023).

In their Motion to Dismiss, the Primis Defendants make the following arguments: (1) Plaintiffs' fraud and negligent misrepresentation claims are barred by the parol evidence rule; (2) Plaintiffs' negligent misrepresentation claim fails because it is premised upon omission; (3) Plaintiffs fail to allege several elements to support their fraud and negligent misrepresentation claims; and (4) Plaintiffs' rescission claim fails because Plaintiffs' fraud claim fails. Having considered Primis' Motion to Dismiss, as explained below, the Court finds that the FAC states a claim against the Primis Defendants.

### A.    The parol evidence rule does not bar Plaintiffs' claims against the Primis Defendants

The Primis Defendants argue that the parol evidence rule bars Plaintiffs' fraud and negligent

28

misrepresentation claims. They assert that "Plaintiffs' omission claim is based on the 2019 Oral Promise that a Third Party Collateral Firm would step in and cover the Collateral Shortfall beginning in year two," but the "2022 Loan Agreement," which they define as the letter agreement attached to the Complaint as Exhibit 3, states that "Plaintiffs were responsible for covering the Collateral Shortfall at all times, every year and that no 'parol evidence' is 'required to interpret the terms of this' agreement." (Doc. No. 19-1, PageID #460–61.) Under the loan documents, the Primis Defendants assert that Plaintiffs "were the sole parties responsible for filling the Collateral Shortfall." (*Id.*) According to the Primis Defendants, "[b]ecause the written contract covers the same subject and assigns responsibility exclusively to Plaintiffs, [Ohio law] bars Plaintiffs from enforcing a contradictory side promise." (*Id.*) The Primis Defendants also argue that contractual provisions in the loan documents, as a matter of law, cannot sustain a fraud claim. (*Id.*)

In response, Plaintiffs make two arguments. They first argue that the parol evidence rule does not apply here because "there is no fully integrated written agreement at issue in this case with respect to Defendants." (Doc. No. 24, PageID #537.) According to Plaintiffs, the Deal "involved multiple complex transactions involving loans, various legal entities, multiple insurance policies and layers upon layers of agreements." (*Id.*) As support for this, Plaintiffs cite to the letter agreement, which provides, "[t]his letter agreement, together with all bank documents issued hereunder shall govern this loan." (*Id.*) Second, Plaintiffs, relying on *Galmish v. Cicchini,* 734 N.E.2d 782 (Ohio 2000), argue that the "related promises were made independently of the written terms of the loan agreements with the express purpose of inducing Plaintiffs' signatures. They were not an attempt to re-write the terms of any document that was signed; instead, it was a false promise solely intended to induce Plaintiffs to enter into the transaction." (*Id.* at PageID #538.)

In their Reply, the Primis Defendants argue that "the 2022 Loan Agreement plainly represents the final expression of the terms between Primis and Plaintiffs concerning the loan." (Doc. No. 27, PageID #664.) They assert that "[t]he Guaranty—one of the documents executed as part of the 2022 Loan Agreement—contains both an integration clause and an express no-parol evidence provision" and "the Promissory Note— another component of the 2022 Loan Agreement—explicitly states that the 2022 Loan Agreement is 'separate from the insurance transaction with' the insurance company." (*Id.*) According to the Primis Defendants, "[t]hat Plaintiffs planned to use the loan proceeds to enter into insurance contracts and pay premiums on the Policies is not relevant to whether the 2022 Loan Agreement is integrated and whether parol evidence may be used; the 2022 Loan Agreement remains the complete and integrated expression of the parties' rights and obligations with respect to the loan." (*Id.* at PageID #664–65.) They also assert that "[c]ourts routinely treat a group of interrelated documents that reference one another and govern the same transaction as a single integrated agreement." (*Id.* at PageID #665.) The Primis Defendants then distinguish *Galmish* by arguing that "[t]he Galmish plaintiff claimed that the defendant included a term in the agreement knowing full well that he never intended to perform," but "[b]ecause the parol evidence did not contradict the contract's terms, the court allowed it." (*Id.* at PageID #666.)

Under Ohio law,[6] the parol evidence rule precludes introduction of extrinsic evidence that

---

[6] A federal court sitting in diversity jurisdiction generally applies the substantive law of the State in which it sits. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Here, however, the loan documents at issue contain Virginia choice-of-law clauses. Ordinarily, then, the Court would employ Ohio's substantive choice-of-law rules to determine whether to enforce the Virginia law choice-of-law clauses included in the loan documents. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). For the following reason, the Court declines to do so here. The parties have waived application of Virginia law by failing to suggest, in either the pleadings or in any filing in this case, that Virginia law should govern. *See, e.g., Atlas Indus. Contractors, LLC v. In2gro Techs.*, 2021 U.S. Dist. LEXIS 56630, at *4–5 (S.D. Ohio Mar. 25, 2021) (parties waived application of choice of law provision in contract by failing to address it or explain the difference between the chosen law and the law of the forum; *BMO Harris Bank, N.A.*, 2024 U.S. Dist. LEXIS 194953, at fn 3 (same). Accordingly, and in the absence of any

30

contradict or vary the terms of a written instrument. *See*, *e.g.*, *Galmish v. Cicchini*, 734 N.E.2d 782, 789 (Ohio 2000). But "the parol-evidence rule does not automatically invalidate claims of fraudulent inducement." *Pierre Invs., Inc. v. Anspach Meeks Ellenberger, LLP*, No. 23-3423, 2024 U.S. App. LEXIS 10561, at *20 (6th Cir. Apr. 29, 2024). While a plaintiff can use parol evidence to prove fraud, "the parol evidence rule may not be avoided 'by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing.'" *Galmish*, 734 N.E.2d at 790 (quoting *Marion Prod Credit Assn. v. Cochran*, 535 N.E.2d 325, paragraph three of the syllabus (Ohio 2000)). Accordingly, "a fraud claim may not be maintained where the alleged fraud is directly contradicted by a signed writing." *Fontbank, Inc. v. CompuServe, Inc.*, 742 N.E.2d 674, 680 (Ohio App. 10th Dist. 2000); *accord Saad v. GE HFS Holdings, Inc.*, 366 F. App'x 593, 601 (6th Cir. 2010). In other words, a plaintiff may not rely on parol evidence that is "within the scope of the subject matter of the written contract," which is "not included therein" and "directly contradictory to the terms of the signed written agreements." *Glazer v. Lehman Bros.*, 394 F.3d 444, 457 (6th Cir. 2005). Ohio courts also extend this rule to negligent misrepresentation claims. *Marathon Petroleum Co., LP v. Noil Petroleum Corp.*, No. 3:16-cv-2694, 2020 U.S. Dist. LEXIS 13508, at *11–12 (N.D. Ohio Jan. 28, 2020); *Williams v. Spitzer Autoworld Canton, L.L.C.*, 913 N.E.2d 410, 416 (2009) (citing *Ed Schory & Sons*, 662 N.E.2d 1074, 1080–81 (1996)).

The Court finds that the parol evidence rule does not demand dismissal here. Plaintiffs generally allege that "[d]uring negotiation of the Premium Loan Facility, Defendants made affirmative representations to Plaintiffs that Plaintiffs would have no financial obligations or

---

argument or suggestion to the contrary by the parties, the Court applies Ohio law. *See Firestone Fin., LLC v. Globe Transp., Inc.*, No.1:24CV2232, 2025 U.S. Dist. LEXIS 250121, at *14, n.5 (N.D. Ohio Dec. 4, 2025) (Barker, J.).

liabilities related to the Premium Loan Facility, or the collateral gap financing." (Doc. No. 25-1, ¶ 77.) Although the promissory note and guaranty directly contradict a representation that "Plaintiffs would have no financial obligations or liabilities," the Court finds that the loan documents do not directly contradict the representation concerning "collateral gap financing."

The Primis Defendants assert that "the 2022 Loan Agreement expressly states that Plaintiffs were responsible for covering the Collateral Shortfall at all times, every year." (Doc. No. 19-1, PageID #461.) The loan documents do not say this. Although the letter agreement does state that "[t]he transaction must be fully collateralized at all times," it does not state that Plaintiffs "were responsible for covering the Collateral Shortfall at all times, every year." (Doc. No. 1-3.) Indeed, the letter agreement is consistent with a third-party pledging additional collateral to support the loan in the future. (*Id.* ("Based on the illustrations provided there is a projected collateral requirement for the term of the loan. Based on the proposed loan balance at maturity the maximum additional collateral requirement is projected in year 5 of the loan and is projected to be $1,787,787").) Furthermore, just because Gross pledged the initial collateral, does not mean that a third-party could not step in to pledge additional collateral at a different date. In other words, there is nothing in the loan documents preventing the "Deal," as allegedly promised to Plaintiffs, from materializing. Furthermore, the presence of integration clauses in the loan documents does not require dismissal. *See*, *e.g.*, *Galmish*, 734 N.E.2d at 790 ("Thus, the presence of an integration provision does not vitiate the principal that parol evidence is admissible to prove fraud").

Put simply, there is nothing in the loan documents *directly* contradicting the alleged misrepresentations concerning the third-party collateral aspect of the "Deal." Without a contractual provision that "directly contradicts the allegedly fraudulent misrepresentations at issue," the Court

32

declines to dismiss Plaintiffs' fraud and negligent misrepresentations claims pursuant to the parol evidence rule. *P.J. Lindy & Co. v. Savage*, No. E-18-028, 2019 Ohio App. LEXIS 789, at *28 (Ohio App. 6th Dist. Mar. 1, 2019); *see also Nations Lending Corp. v. Patille*, No. 1:22-cv-02102-PAB, 2023 U.S. Dist. LEXIS 155026, at *20 (N.D. Ohio Aug. 23, 2023) (declining to dismiss fraud claim because "Patille's fraud allegation does not *directly* contradict the Employment Agreement") (Barker, J.); *Houser v. Powerdot, Inc.*, No. 1:21CV915, 2022 U.S. Dist. LEXIS 239410, at *15 (N.D. Ohio July 11, 2022) ("The parol evidence rule does not exclude Glader's statement about PowerDot's $50 million valuation because the Employment Agreement does not contain a statement that directly contradicts Glader's statement").

### B.      Plaintiffs' negligent misrepresentation claim is not based entirely on an omission.

In their Motion, the Primis Defendants argue that "Plaintiffs' theory of liability rests on an alleged omission that Primis purportedly failed to include reference to the Third Party Collateral Firm in the loan documentation." (Doc. No. 19-1, PageID #462.) They assert that Ohio law does not permit a negligent misrepresentation claim to proceed on an omission theory. (*Id.*) They further assert that "[b]ecause Plaintiffs do not identify any affirmative misrepresentation supplied by Primis, their negligent misrepresentation claim fails." (*Id.* at PageID #463.)

Plaintiffs respond arguing that "the Defendants mischaracterize Plaintiffs' complaint as being grounded in a theory of omissions" because "there are numerous affirmative misrepresentations that are enumerated in the Complaint." (Doc. No. 24, PageID #540.)   According to Plaintiffs, "the 'omission' cited by Defendants relates to a material affirmative representation that was actually made to Plaintiffs by Defendants to induce them to enter into the transactions: more or less to 'go ahead and sign the documents we prepared for you, no need to worry, the collateral firm will come

through.'"  (*Id.*)

In their Reply, the Primis Defendants assert that Rule 9(b) prevents a plaintiff from "lumping" defendants together, and in this case, every allegation refereed in Plaintiff's Opposition "improperly attributes statements collective to 'Defendants' without identifying any statements made by Primis Exclusively." (Doc. No. 27, PageID #668.)  The Primis Defendants then argue that "even if the Court were to accept that the Complaint's group allegations could be attributed to Primis, they cannot be credited because they are contradicted by Plaintiffs' own factual allegations."  (*Id.*)  They further argue that Plaintiffs are attempting, impermissibly, to "amend their pleading through an opposition brief to avoid dismissal."  (*Id.* at PageID #669.)  Finally, the Primis Defendants argue that "[i]t is therefore implausible to attribute to Primis a statement the Complaint itself alleges was approved by Cool Springs and expressly adopted by Plaintiffs as their own."  (*Id.* at PageID #670.)

The Court rejects the Primis Defendants' arguments because they presuppose that Rule 9(b) applies to Plaintiffs' negligent misrepresentations claims against them.  But does Rule 9(b) apply to negligent misrepresentation claims arising under Ohio law?  The Sixth Circuit has found that "[w]hether a state-law claim sounds in fraud, and so triggers Rule 9(b)'s heightened standard, is a matter of substantive state law, on which we must defer to the state courts." *Republic Bank & Trust Co. v. Bear Stearns*, 683 F.3d 239, 247 (6th Cir. 2012).  After applying Kentucky law, the Sixth Circuit found in *Republic Bank* that the plaintiff's negligent misrepresentation claim brought under Kentucky law "must satisfy Rule 9(b)'s heightened pleading standard to survive dismissal."  *Id.* at 248.

Pursuant to *Republic Bank*, the Southern District of Ohio has observed, "[a] review of Ohio case law shows that negligent misrepresentation claims do not sound in fraud and are treated

34

separately." *Rheinfrank v. Abbot Labs.*, No. 1:13-cv-144, 2013 U.S. Dist. LEXIS 113289, at *11 (S.D. Ohio Aug. 12, 2013). The *Rheinfrank* court thus concluded that "[b]ecause whether a state-law claim sounds in fraud is a matter of state law, and because Ohio courts distinguish negligent misrepresentation claims from fraud claims, the Court applies Rule 8(a) to Plaintiffs' claim for negligent misrepresentation and Rule 9(b) to Plaintiffs' fraud claim." *Id.* at *11. The Court finds *Rheinfrank* persuasive and therefore applies Rule 8, and not Rule 9(b), to Plaintiffs' negligent misrepresentation claims. *See also Mosaic Fin. Ltd. v. Mut. S'Holder Servs., LLC*, 767 F. Supp. 3d 619, 638 (N.D. Ohio 2025) (applying Rule 8 to negligent misrepresentation claims arising under Ohio law); *C. Norris Mfg., LLC v. BRT Heavy Equipment, LLC*, No. 5:14CV2797, 2016 U.S. Dist. LEXIS 100499, at *15 (N.D. Ohio Aug. 1, 2016) ("The Court finds that Counterclaim-Plaintiffs are correct and their negligent representation claim is appropriately viewed under the Rule 8(a) standard").[7] And because Rule 8 governs the negligent misrepresentation claim, the "lumping" rule does not apply to Plaintiffs' negligence misrepresentation claims. *Detrick v. KCS Int'l Inc.*, 781 F. Supp. 3d 588, 623 (N.D. Ohio 2025) ("The 'particularity' requirement of Rule 9(b) precludes plaintiffs from 'lumping' allegations against multiple defendants together, and it requires them to identify which defendant 'made a particular misrepresentation'") (Barker, J.).

Under Rule 8, and construing the allegations in Plaintiffs' favor, the Court finds that Plaintiffs have alleged affirmative misrepresentations. The Primis Defendants are correct that the FAC does

---

[7] The Primis Defendants cite two cases to support their argument that Rule 9(b) applies to Plaintiffs' negligent misrepresentations claims: *Mulbarger v. Royal Alliance Assocs.*, No. C-2-96-0739, 1999 U.S. Dist. LEXIS 23566 (S.D. Ohio Dec. 22, 1999) and *In re Nat'l Century Fin. Enters., Inv. Litig.*, 504 F. Supp. 2d 287 (S.D. Ohio 2007). The *Mulbarger* court did find that "[t]he standards of Rule 9(b) apply to claims of negligent misrepresentation" as the Primis Defendants contend, but it relied on out-of-circuit case law to reach that conclusion, and the court did not determine how Ohio courts consider negligent misrepresentation claims. *Nat'l Century* actually supports the Court's conclusion in this case. The *Nat'l Century* court looked to Ohio law and concluded that Rule 8 should apply to a negligence misrepresentation claim.

not explain their role in detail. This then begs the question—when did the Primis Defendants allegedly first interact with Plaintiffs? The Primis Defendants assert that it was not until 2022, nearly three years after Cool Springs pitched the Deal. But the FAC alleges that Gleicher (Primis' agent) "served as [one of] the main points of contact for Plaintiffs, centrally coordinating the Deal *in all aspects*, including without limitation: (i) making detailed pitches and illustrations that Plaintiffs would enjoy the "guaranteed" benefits of a zero-risk investment in a Pacific Life insurance policy that would not require any personal expenditures after one year and a day[.]" (Doc. No. 25-1, ¶ 11 (emphasis added).) Plaintiffs further allege that Gleicher had "knowledge of the Deal's entire structure." (*Id.* at ¶ 56.) And Plaintiffs allege that each Defendant "supplied misleading information regarding the feasibility of a third-party Collateral Firm actually stepping in to cover Plaintiffs' collateral gap, and that the Deal would be zero risk and 'no cost' to Plaintiffs." (*Id.* at ¶ 85.) Construing these allegations in Plaintiffs' favor, the Court finds that Plaintiffs have alleged something more than an omission.

Although the Primis Defendants are correct that omissions cannot sustain a negligent misrepresentation claim, see *Remington Lodging & Hosp., LLC v. Cleveland Airport Hosp. II, LLC*, No. 1:24cv2031, 2025 U.S. Dist. LEXIS 257300, at *38 (N.D. Ohio Dec. 12, 2025) (citing cases), Plaintiffs allege more than omissions. Therefore, Plaintiffs' negligent misrepresentation claims can proceed to the extent they are not premised on omissions.

**C.  Plaintiffs have adequately pleaded the basic elements of their fraud and negligence misrepresentation claims.**

The Primis' Defendants next argue that Plaintiffs' fraud and negligent misrepresentation claims fail to allege (1) "that Primis had knowledge of the 2019 Promise or the terms of the Deal—an essential predicate for both claims," (2) "that Primis owed Plaintiffs a duty to disclose," and (3)

"that Plaintiffs justifiably relied on any alleged omission or misrepresentation."  Having considered the parties' arguments, the Court disagrees, as explained below.

### 1. Plaintiffs have adequately pled that Primis had knowledge of the "Deal".

In their Motion to Dismiss, the Primis Defendants argue that "[t]he Complaint lacks any non-conclusory allegations that Primis had knowledge of the 2019 Promise or the Deal terms, and it certainly does not contain the particularized allegations required under Rule 9(b) to plead such knowledge."  (Doc. No. 19-1, PageID #463.)  According to them, "[t]he only allegations Plaintiffs offer are boilerplate conclusions that Steven Gleicher had 'knowledge of the Deal's entire structure' and that Primis made misrepresentations it 'knew were untrue and material at the time of the loan.'"  (*Id.*)  They assert that "[t]here are no allegations Primis participated in structuring the Deal, communicated with Cool Springs or the supposed Third Party Collateral Firm regarding the Deal, or that Gross ever told Primis about the 2019 Oral Promise."  (*Id.* at PageID #464–65.)  They then argue that this supposed lack of knowledge "undermines several essential elements of fraud and negligent misrepresentation claims."  (*Id.* at PageID #465.)

In response, Plaintiffs argue, in a footnote, that "Defendants appear to make an argument that Defendants' knowledge of the fraud was insufficiently pled; however, Fed. R. Civ. P. 9(b) only requires that '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'"  (Doc. No. 24, PageID #539.)  In their Reply, the Primis Defendants argue that "Rule 9(b) does not excuse Plaintiffs from alleging some specific facts supporting an inference that Primis knew a statement was false or misleading at the time it was made." (Doc. 27, PageID #671.)  They also argue that "without any allegation that Primis knew a Third Party Collateral Firm would not fund the loan, the only plausible inference is that Primis believed such a firm would step in when it

allegedly made those representations to Plaintiffs." (*Id.* at PageID #672.)

Primis has not cited any authority establishing that a plaintiff must plead "knowledge" to sustain a negligent misrepresentation claim, and indeed, the elements required to sustain a claim do not require a plaintiff to plead "knowledge." The Court therefore rejects the Primis Defendants' assertion that Plaintiffs' negligent misrepresentation claim fails based on a supposed failure to plead knowledge.

Of course, a fraud claim is different. Although 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," simply alleging knowledge is not enough. As explained by the Supreme Court:

> It is true that Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid--though still operative--strictures of Rule 8. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b)"). And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

*Ashcroft*, 556 U.S. at 686–87. Thus, to survive dismissal, a complaint must contain enough facts to allow a court to infer that the defendant plausibly acted with a certain state of mind. *Katoula v. Detroit Entm't, LLC*, 557 F. App'x 496, 498 (6th Cir. 2014); *Cruger v. Prelesnik*, 761 F.3d 610, 617 (6th Cir. 2014).

Although the allegations are sparse concerning the Primis Defendants' alleged knowledge,

38

the Court finds these allegations are sufficient. As already explained above, Plaintiffs allege that Gleicher had "knowledge of the Deal's entire structure" and "served as the main points of contact for Plaintiffs, centrally coordinating the Deal in all aspects." (Doc. No. 25-1, ¶¶ 11, 56.) They also allege that "Defendant Primis knowingly allowed Defendants Cool Springs to complete its loan documents without verifying the factual basis of the applicant and is part of a pattern where Defendant Primis, including through its agents, purposefully avoided "know-your-customer" regulations in order to push through profitable and low risk premium finance deals with Defendants Cool Springs, and presumably others." (*Id.* at ¶ 53.) That allegation, which the Court must construe as true, implies that Primis and Cool Springs had an ongoing relationship concerning transactions similar to the "Deal." Taken together, these allegations do support an inference that the Primis Defendants had knowledge of the "Deal."

### 2. Plaintiffs have sufficiently alleged a duty to disclose

In their Motion to Dismiss, the Primis Defendants argue that "the Complaint does not 'alleg[e] the source of a duty to disclose' or 'state grounds upon which it can subject [Primis] to a duty to disclose' the 2019 Promise." (Doc. No 19-1, PageID #467.) According to them, "[t]he Complaint does not allege that Plaintiffs reposed any special trust or confidence in Primis, or that Primis was aware of such confidence. Nor does it allege that Plaintiffs ever sought Primis' 'guidance' with respect to the 2022 Loan Agreement, or that any special relationship existed between the parties." (*Id.*)

Plaintiffs do not meaningfully respond to this argument, but instead state generically that "the duty imposed on a bank, like Primis is inherent to the facts alleged." (Doc. No. 24, PageID #540.) The Primis Defendants argue in their Reply that "[t]he Opposition does not dispute that the loan

transaction was at arm's-length, and as the Motion made clear, the Complaint establishes none of the above." (Doc. No. 27, PageID #673.) Responding specifically to Plaintiffs' short argument, the Primis Defendants argue that "Plaintiffs do not even address Primis' point that negligent misrepresentation requires a special relationship and Plaintiffs never sought Primis' guidance, thereby conceding the point." (*Id.*)

### i.   Plaintiffs' fraud claim may proceed on an omission theory

Ohio law generally holds that "the traditional relationship between borrower and lender as one conducted at arm's length with no duty of disclosure." *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 450 (6th Cir. 2012) (citing *Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 367 (Ohio 1988)). And "[i]n the absence of a duty to disclose a concealed fact to the plaintiff, concealment of the fact does not constitute fraud." *Szep v. GM LLC*, 491 F. Supp. 3d 280, 296 (N.D. Ohio 2020). But "the duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Lucas Ford, LLC v. Ford Motor Credit Co.*, No. 3:09CV451, 2011 U.S. Dist. LEXIS 51141, at *19 (N.D. Ohio May 12, 2011) (quoting *State v. Warner*, 564 N.E.2d 18 (Ohio 1990)); *see also Blon*, 519 N.E.2d at 367 ("Such a duty may also arise out of an informal relationship where both parties to a transaction understand that a special trust or confidence has been reposed").

But Plaintiffs' have alleged some facts showing that they placed some trust or confidence in the Primis Defendants. Plaintiffs have alleged that they "they vested their confidence, good faith, reliance and trust in [the Primis Defendants] whose aid, advice, and protection was sought on matters of retirement and financial planning," and that "[t]his advice went far beyond a single routine insurance transaction and created a relationship of trust." (Doc. No. 25-1, ¶ 41.) Plaintiffs' legal

40

conclusion that there was a "relationship of trust" is supported by their allegations that:

> Gleicher served as the main points of contact for Plaintiffs, centrally coordinating the Deal in all aspects, including without limitation: (i) making detailed pitches and illustrations that Plaintiffs would enjoy the "guaranteed" benefits of a zero-risk investment in a Pacific Life insurance policy that would not require any personal expenditures after one year and a day; (ii) filling out misleading financial disclosures and loan applications on behalf of Plaintiffs for submission to Defendants Primis and PacLife to inflate Plaintiffs' net worth and liquidity; (iii) creation of the limited liability companies that would be the beneficiaries of the policies issued pursuant to the deal and which would be used to sell membership interests to the Collateral Firm after one year and a day; and (iv) acting as the only "gatekeeper" that would ensure the success of the Deal even when Plaintiffs began to question the Deal's viability toward the end of the first year.

(*Id.* at ¶ 11.)   Construing these allegations in Plaintiffs' favor, the Court finds that that these allegations are sufficient to sustain a fraudulent omission claim.

### ii. Plaintiffs' have sufficiently alleged a "special relationship" to sustain their Negligent misrepresentation

The Court finds that the FAC plausibly satisfies Ohio's "special relationship" requirement.

This Court has recently had the opportunity to summarize the law surrounding this requirement:

> This district recently addressed the relevance of a "special relationship" in reference to a negligent misrepresentation claim under Ohio law. *See Mosaic Fin. Ltd. v. Mut. S'holder Services, LLC*, --- F. Supp.3d ---, 2025 WL 524593 (N.D. Ohio Feb. 18, 2025). In *Mosaic*, the court first noted that a "special relationship" is not a separate element of negligent misrepresentation. *Id.* at *21. However, the "Ohio Supreme Court interprets the requirement that a defendant supplies information for guidance in business transactions to mean that the plaintiff must be a member of a limited class of people who foreseeably rely on the defendant's representations." *Id.* (citing *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St. 2d 154, 436 N.E.2d 212, 214-15 (Ohio 1982)).
>
> Ultimately, "the determinative question is whether the plaintiff belongs to a 'faceless or unresolved class of persons' or 'a known group possessed of vested rights, marked by a definable limit and made up of certain components.'" *Id.* (citing *Haddon View*, 436 N.E.2d at 214). Following the Ohio Supreme Court's guidance, the *Mosaic* court concluded that the "focus is on whether such a plaintiff's reliance was foreseeable." *Id.* (citing *Haddon View*, 436 N.E.2d at 215). The court further clarified that the "legal analysis under the special-

41

relationship test" in Ohio was not determined by whether the defendants themselves "reasonably foresaw that [p]laintiffs would rely on the [representations]," nor by "the sophistication of the plaintiff." *Id.* at *22. Applying these principles, the court concluded that a special relationship was pled based on the defendants allegedly supplying false statements regarding an investment share class to the plaintiffs, who were "members of a limited identifiable group who relied on those statements" as the only shareholder in that class. *Id.*

Other courts within this district have reached similar conclusions. *See, e.g.*, *Benedettini Cabinets, L.P. v. Sherwin-Williams Co.*, 695 F. Supp.3d 948, 964 (N.D. Ohio 2023) (finding that plaintiff adequately pled negligent misrepresentation by alleging that defendant "allegedly made specific representations to [plaintiff] in response to complaints it received from its customers—not generic statements to the market or another amorphous group"); *cf. Miller v. Kent Nutrition Group, Inc.*, 2016 WL 11246420, at *9-10 (N.D. Ohio Sept. 16, 2016) (finding no special relationship because plaintiff failed to "allege facts that indicate[d] she was a person, or part of a limited class of persons, whose reliance on [defendant's] certification in the course of business was foreseeable").

*DG Gas, LLC v. Ta Franchise Sys. LLC*, 2025 U.S. Dist. LEXIS 47159, at *108–110 (N.D. Ohio Mar. 14, 2025) (Barker, J.).  Applying this standard, the Court concluded:

Having set forth the above principles, the Court hereby concludes that Plaintiffs have plausibly alleged a claim for negligent misrepresentation.  DG Gas relies on the Representations contained in the FDDs in support of its negligent misrepresentation claim.  (Compl. at ¶¶ 84–88, 153–56.)  The FDDs were provided specifically to DG Gas to "summarize[] certain provisions of your Franchise Agreement" and to "help you make up your mind" as to whether to purchase a franchise.  (2019 FDD, Doc. No. 1-1 at PageID #41; 2021 FDD, Doc. No. 1-2 at PageID #233.)  These facts make clear that DG Gas is not a "faceless or unresolved class of persons" relying on TA's alleged Representations, but rather an entity "marked by a definable limit" as a prospective franchisee.  *Mosaic*, 2025 WL 524593, at *21.  Simply put, DG Gas is undeniably a "person or member of a limited class of persons whom [TA] intend[ed] to benefit or guide with the information supplied."  *Pacifica Loan Five, LLC v. Fifth Third Bank*, 2011 WL 13228111, at *10 (S.D. Ohio Apr. 14, 2011).

Construing the Complaint in the light most favorable to Plaintiffs and considering the FTC Franchise Rule, Plaintiffs have sufficiently alleged that DG Gas's "reliance was foreseeable."  *Mosaic*, 2025 WL 524593, at *21.  The Court therefore finds that any "special relationship" required by Ohio law is satisfied at this early pleading stage, and accordingly, declines to dismiss Count Four.

42

*Id.*

The Court reaches the same conclusion here.  Plaintiffs, as the recipient of the loan proceeds from Primis, are each undeniably a person or member of a limited class of persons whom Primis intended to benefit or guide with the information supplied.  The Court further finds, after construing the FAC in the light most favorable to Plaintiffs, that they have sufficiently alleged that Plaintiffs' "reliance was foreseeable."  The Court therefore rejects the Primis Defendants' argument that Plaintiff failed to plead a "special relationship" sufficient to sustain a negligent misrepresentation claim.

### 3. The Court rejects the Primis Defendants' justifiable reliance argument.

The Primis Defendants' only argument regarding justifiable reliance is that "because the 2022 Loan Agreement directly contradicts the alleged 2019 Oral Promise, Plaintiffs cannot establish justifiable reliance."  (Doc. No. 19-1, PageID #468.)  Because the Court has found that the parol evidence alleged in the Amended Complaint does not directly contradict the loan documents, the Court rejects this argument.

### D. Plaintiffs' FAC states valid claims of rescission against the Primis Defendants

The Primis Defendants' final argument in its Motion to Dismiss is that "[b]ecause Plaintiffs' fraud claim fails, Plaintiffs' rescission claim necessarily fails."  (Doc. No. 19-1, PageID #468.)  As explained above, Plaintiffs have stated a valid claim for fraud.  The Court therefore will not dismiss Plaintiffs' rescission claim against the Primis Defendants.

## VI. Conclusion

For the following reasons, Primis's Motion to Dismiss (Doc. No. 19) and Pacific Life's Motion to Dismiss (Doc. No. 21) are DENIED.  Plaintiffs' Motion for Leave (Doc. No. 25) is

43

GRANTED.   Plaintiffs shall file their Amended Complaint upon receipt of this Memorandum Opinion & Order.

 **IT IS SO ORDERED.**

            *s/Pamela A. Barker*
            PAMELA A. BARKER
Date:  April 16, 2026       U. S. DISTRICT JUDGE